## ARMENTROUT v. VIRGINIAN RY. CO.
### Civil Action No. 550.

District Court, S. D. West Virginia.
Aug. 16, 1947.

Lilly & Lilly, of Charleston, W. Va., for plaintiff.

John R. Pendleton, of Princeton, W. Va., and Fletcher W. Mann, of Beckley, W. Va., for defendant.

MOORE, District Judge.

The first trial of this case resulted in a hung jury. At the second trial the jury returned a verdict in favor of the plaintiff in the amount of $100,000. On appeal the Circuit Court of Appeals reversed the case and remanded it for a new trial. 4 Cir., 158 F.2d 358. It was tried a third time and at the conclusion of this latest trial the jury returned a verdict in favor of the plaintiff for $160,000.

Defendant moved the Court to set aside the verdict and grant defendant a new trial, assigning five grounds. Four of these are general. They allege the admission by the Court of improper evidence and improper cross examination; argumentative and adverse instructions and comment by the Court; and that the verdict is not supported by the law and the evidence. Specifically, as might be naturally expected, defendant assigns as a ground for setting aside the verdict and granting it a new trial that the verdict is excessive.

After the assignment of the foregoing grounds, defendant assigned further grounds Numbers 6 and 7, as follows:

"6. The verdict of the jury is a quotient verdict and is not the true verdict of the entire jury.

"7. The amount of the verdict was induced by instructions of the Court argumentative and adverse to the defendant, improper argument of counsel for the plaintiff to the jury, adverse publicity given to the case during the trial by Charleston newspapers to which the jury had access, and sympathy of the jurors for the infant plaintiff."

Defendant filed in support of its motion an affidavit of Cecil A. Perdue, one of the jurors, and several clippings from Charleston newspapers published during the course of the trial.

No comment is necessary as to the general grounds assigned by defendant in support of its motion. Objections to the admission of evidence were made and argued by counsel during the course of the trial, and the Court in passing on the objections gave its reasons for admitting the evidence objected to, all of which still appear to the Court to be sound. Only one exception to the Court's charge was taken. This exception related to the Court's comments with reference to the testimony of defendant's witness Murdock. In reviewing the charge I can find nothing therein which would lead me to sustain the exception.

The seventh ground now assigned, criticising the charge of the Court as being argumentative and adverse, and alleging improper argument of counsel for the plaintiff to the jury and adverse publicity in the newspapers, can furnish no reason for setting aside the verdict and granting a new trial. No objection was made at the time to any part of the argument of counsel on either side. No particular ojectionable statement of counsel is pointed out. As said above, only one specific exception was taken to the charge. Therefore, the objection now made both as to counsel's argument and as to the Court's charge comes too late. Federal Rules of Civil Procedure, Rule 51, 28 U.S.C.A. following section 723c; United States v. Socony-Vacuum Oil Co., 1940, 310 U. S. 150, 60 S.Ct. 811, 84 L.Ed 1129, rehearing denied 310 U. S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421. As to the allegation of adverse publicity in the newspapers, a perusal of the newspaper articles reveals nothing which supports this contention. The stories are merely the ordinary reporters' accounts of what took place in the trial. Articles such as these appear in connection with every case tried, and to undertake to suppress them would be a serious interference with the liberty of the press. In my opinion, it would be unreasonable to keep from a jury trying a civil case all newspapers which might publish accounts of the trial during its progress. Nothing

is apparent in any of the articles which would be calculated to influence a juror either for or against the plaintiff. United States v. Reid et al., 12 How. 361, 53 U. S. 361, 13 L.Ed. 1023.

The sixth ground is supported by an affidavit of one of the jurors, Cecil A. Perdue, who says in his affidavit that the verdict was contrary to his convictions, and that he agreed to it with the hope that it would be set aside as unreasonable; and that the verdict was arrived at by each juror writing down the amount he thought the plaintiff was entitled to, the approximate sum, divided by twelve, being the amount of the verdict returned. He also says in his affidavit that if he had been asked by the judge or the clerk if he agreed to the verdict, his answer would have been no.

■ Generally speaking, public policy does not permit affidavits of jurors to be used to impeach their verdicts. If such a practice should be countenanced, we might expect after every important trial a long series of charges and counter-charges relating to supposed irregularities and misconduct of jurors while in the jury room. The obvious confusion and uncertainty which would result far out-weigh any local or temporary advantage that might be said to follow in an individual case from the reception of an affidavit by a juror to impeach his verdict. McDonald v. Pless, 1915, 238 U. S. 264, 35 S.Ct. 783, 59 L.Ed. 1300.

■ Quotient verdicts are universally frowned upon, and have been set aside in cases where the proof offered to establish the fact was of such character as to be admissible. However, it is not the mere arriving at the average of the jurors' opinions as to the amount of damage which makes the quotient verdict bad. The vice consists in an agreement by the jurors before announcing the respective amounts that they will be bound by the result of the addition and division. Parshall v. Minneapolis & St. L. R. Co., C. C., 1888, 35 F. 649. It is quite natural that each juror should be asked to state the amount he thinks should be awarded, and it is not unusual that the verdict finally returned should be the approximate average of these amounts. It will be noted that Perdue does

not say in his affidavit that either he or any other juror was in favor of finding a verdict for the defendant. He merely states that he was convinced at the time that the amount of the verdict was too large.

■ The statement in his affidavit that if he had been asked individually by the judge or the clerk if he agreed to the verdict his answer would have been no is contradicted by the record as taken down by the official reporter. This record shows that with all the jurors present the jury were asked if they had agreed on a verdict. The foreman replied, "We have, your Honor." The clerk then read the verdict and after so doing asked the jurors the following question: "And so say each of you?" The record shows that the jury answered, "Yes." It is the practice in this court that if counsel wish the jury to be polled, they must request it. No request was made in this case. However, the Court knows from observation at the time that the record of the reporter to the effect that the jury answered "Yes" was justified by the fact that all the jurors, in answer to the clerk's question, signified their assent by nodding their heads or making other affirmative gestures or statements. Had they done or said nothing in response to the clerk's question, the conclusion would be the same. If any member of the jury disagreed with the verdict, it was his duty to say so, and not having said so at the time, he cannot be heard afterwards to make that claim.

■ Therefore, the sixth ground of the defendant's motion cannot be sustained.

The only substantial argument in support of the motion to set aside the verdict and grant a new trial is that the verdict is excessive.

■ Courts are not permitted to substitute their own judgment in matters of damage for that of the jury. It is only in those cases where the amount of the verdict is so large as to demonstrate clearly to the Court that it must have been the result of a gross error in applying legal principles, or that it is based on passion, prejudice or sympathy, that the Court may justly set it aside. Barry v. Edmunds, 1886, 116 U. S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (quoting from

Mr. Justice Story, 2 Story, 661, 670); Burch v. Southern Pac. Co., C.C.1906, 145 F. 443 (reversed on other grounds); Dumphy v. Norfolk & W. Railway Co., 1918, 82 W. Va. 123, 95 S.E. 863, 10 A.L.R. 1152. The mere fact that it may be larger than any verdict heretofore rendered in like circumstances is not decisive, although it is a fact to be considered. The largest verdict which may at any particular time be cited as having been approved by a court was, at the time of its rendition, larger than any which had gone before, and was therefore subject to the criticism that there were no precedents to justify it. The Court must take into consideration every proper circumstance in its effort to reach a just conclusion with respect to the challenged verdict.

The jury were told in the Court's charge what elements should be considered in arriving at the amount of their verdict. The charge followed closely the opinion rendered by the Circuit Court of Appeals in its reversal of the former trial.

 In seeking to discover whether or not the jury were actuated by any improper motives in arriving at the amount of the verdict, we should attempt to measure the monetary value of the different elements of damage which were proper for their consideration; bearing in mind the decreased value of the dollar, which has come about very rapidly during the past few years.

The attention of the jury was not specifically directed to the low purchasing power of money, although in my opinion such a suggestion by the Court would have been proper, and certainly the jury were entitled to take that circumstance into consideration. It may be argued that ordinary fluctuations in the purchasing power of money may not properly be considered by a jury in awarding damages. Perhaps not, as to the future; but the jury have the right, and it is their duty, to be realistic. They need not close their eyes to the economic facts of life. It is possible, of course, that values may cease to be affected by inflation of the currency. Economic conditions may conceivably cause the value of the dollar again to rise to the point where it stood before the World War II. On the other hand,

there is no assurance that its value may not become less as time goes on. This possibility balances, if it does not outweigh, the contrary forecast. It would be, I think, mere speculation to adopt either theory as the foundation of an estimate of future earnings. Yet some reasonable and logical basis for such an estimate must be found; and, in my opinion, it can be found only by an appraisal of present economic facts, of which the jury are presumed to have knowledge. No one can say now whether a verdict of $160,000 rendered today may be equivalent to one of $300,000 or to one of $80,000 rendered five years hence. We can be guided only by the conditions of the present; and under those conditions, we learn from economic statistics that $160,000 now represents a value of approximately $100,000 in 1939. See Monthly Labor Review, United States Department of Labor, Bureau of Labor Statistics, May 1947, p. 879, table No.1; West Virginia Department of Labor Cost of Living Survey, 1947 Prices (Spring) Compared with 1940 Prices (Spring), Percent Increase Over 1940.

 In estimating plaintiff's potential earnings as an able bodied man, the jury would not be justified in classifying him in a professional or highly skilled occupation; and neither would they be required to classify him as a mere day laborer. Some middle course might be taken. It was within the jury's discretion to assume that he would probably engage in some recognized trade, such as carpenter, painter, mechanic, electrician, plumber, or the like. The average earnings of this type of workman would provide a logical standard whereby to arrive at a reasonable estimate of future earnings of the plaintiff. This view is supported by evidence in the trial that plaintiff is above the average in intelligence, and that his parents, as shown both by evidence and by their appearance and demeanor, are respectable and moderately well educated people, who would likely give to their children good educational opportunities. Even if it were thought that he might merely have followed his father's occupation of coal loader, it is a matter of common knowledge in the southern West Virginia coal field that the earnings of this type of workman are now at a level which equals, and

often rises above that of the mechanic, electrician, etc., in many cases in this area going as high as $125 per week. The average present day weekly earnings of workmen in these various occupations, exclusive of coal loaders, is approximately $80. See Wage Scale Charleston Building Trades, April 1947.

During the trial, the Court charged the jury in part as follows:

"* * * the expenses flowing from the disability—that is what General Lilly (counsel for plaintiff) was ' talking about when he spoke of the necessity of care—it may not always be necessary for somebody to take care of every want of this child; there may be some appliances that may be fitted on his arms that may permit him to do some things for himself. Certainly, many of the necessary things of life may always have to be done for him, because he has no hands of his own. You are to take that into consideration,—whatever expenses will be necessary to provide that type of care for him."

Defendant did not object to this portion of the Court's charge, but, in support of the motion to set aside the verdict, for the first time contends that the cost of nursing and the additional expense necessary to care for plaintiff's personal needs during his minority cannot be deemed a proper item of damages in this action and that, if recoverable, it must be in an action by the father.

 Under Rule 51, Federal Rules of Civil Procedure, objection to the Court's charge after rendition of a verdict comes too late, since the Court was given no opportunity to consider the objection and correct the charge if there was an error in it. However, I am of opinion that there was no error on this point. It is, of course, settled law that for medical and nursing expenses already incurred before trial the parent has the only right of action against a wrongdoer. Barker v. Saunders, 1935, 116 W.Va. 548, 182 S.E. 289; McCallam v. Hope Natural Gas Co., 1923, 93 W.Va. 426, 117 S.E. 148; Netherlands-American Steam Nav. Co. v. Hollander, 2 Cir., 1894, 59 F. 417; Jackiewicz v. United Illuminating Co., 1927, 106 Conn. 310, 138 A. 151; Sheffield v.

Lovering, 1935, 51 Ga.App. 353, 180 S.E. 523. But with respect to future or prospective expenses of this kind there is quite a division of authority. Some cases support the proposition that the right of action for probable future expenses of nursing and medical care belongs to the parent. Hamlin v. N. H. Bragg & Sons, 1930, 129 Me. 165, 151 A. 197; St. Louis, I. M. & S. Ry. Co. v. Waren, 1898, 65 Ark. 619, 48 S.W. 222; San Antonio St. Ry. Co. v. Muth, 1894, 7 Tex. Civ.App. 443, 27 S.W. 752. Other courts hold definitely that it is the infant who has this right, and this appears to be the modern view, and more in accord with sound reason and equitable considerations. Clarke v. Eighth Avenue Railroad Company, 1924, 238 N.Y. 246, 144 N.E. 516, 37 A.L.R. 1; Cumming v. Brooklyn City R. Co., 1888, 109 N.Y. 95, 16 N.E. 65. See also Stone v. City of Pleasanton, 1924, 115 Kan. 476, 223 P. 303. The reasons for the latter conclusion are discussed forcefully in the Clarke case [238 N.Y. 246, 144 N.E. 517], wherein the Court said: "* * * if the parent be permitted to recover, then the recovery becomes his property. He can do with it as he sees fit. He can will it away, or, if he dies without a will, it becomes part of his estate. In either case, the infant might receive little or no benefit from it. The natural instinct of a parent to properly support his infant children does not always prevail. It is a matter of common knowledge that some do not, and resort has to be made to the statute to compel them to do so. Some parents actually abandon their infant children and leave them objects of charity, or to be maintained and supported by the kindness of relatives or friends."

 I conclude that prospective expenses for care and nursing not already incurred by the parent constitute a proper element of the infant's recovery. I believe this conclusion is supported by the opinion of the Circuit Court of Appeals of this Circuit, written in connection with the reversal of this case on a former appeal. Judge Soper there said [158 F.2d 362]: "The permanent nature of the injury, the pain, suffering and humiliation, the loss of earning power and *the expenses flowing from disability during a long expectancy* were all

proper elements to be considered in making up the verdict." (Emphasis supplied.)

■ The jury could, without overstepping the bounds of their province, suppose for plaintiff a maximum expectancy of 60½ years from the date of the verdict. This conclusion is based both on statements made by counsel during the trial, which were not denied or contradicted, and also upon a mortality table published by one of the large life insurance companies. See Commissioners 1941 Standard Ordinary Mortality Table, The Mutual Benefit Life Insurance Company, Newark, N. J. By this mortality table the expectancy of a child 4 years old is 60.58 years. While the jury were not bound to consider mortality tables, they did have the right to do so, and by the fullest extension of that right they could base their verdict, in my opinion, on the full length of expectancy provided in the mortality table as expressed to them by counsel in the course of the trial.

The only recent federal decision which I have found in which an attempt is made to appraise the limits of a jury's verdict for pain, suffering, humiliation, disfigurement, etc., is that of McKinney v. Pittsburgh & L. E. R. Co., D.C.1944, 57 F.Supp. 813, wherein Judge Goddard of the Southern District of New York estimated that $40,-000 was a reasonable limitation in the case of a man 43 years old (who had therefore a life expectancy of about 26 years), who had lost both feet midway between ankle and knee, and who had sustained other injuries. Upon a comparison of the damages of plaintiff in the instant case to those of the plaintiff in that case, it is seen first, that this plaintiff has an expectancy of more than twice that of the other, and therefore his prolonged humiliation, disfigurement, physical incapacity and other mental and physical results (including perhaps some element of actual pain and suffering), being of a continuing nature, properly enhance the recovery. Secondly, the nature of the injury itself, being a loss of hands in the one case and feet in the other, is much more humiliating and damaging in the case of loss of hands, because this disfigurement cannot possibly be concealed, whereas loss of legs and feet can be, and often is, hidden in such a way as to be virtually unnoticed. For this reason also a jury would be justified in giving a substantially larger verdict in a case of loss of hands and arms than of feet and legs.

■ With these principles in mind I proceed to analyze the jury's verdict in the light of the maximum factors which might properly have gone into its synthesis. I say maximum factors because I believe that to be the proper test after the jury has acted. Since the jury had the power to extend their discretion to its utmost bounds, any less than the greatest would not be a fair test as to whether or not that power was abused.

If by such a test the verdict is found to be so excessive that it cannot be justified, it should be set aside and a new trial granted, or it should be reduced by remittitur to an amount which will not exceed the amount of the product of the maximum factors. Otherwise, it should be sustained as rendered by the jury.

■ I consider the proper factors to be:

(1) An amount which is not unreasonable to compensate for pain, suffering, humiliation, permanent disfigurement, inconvenience and physcial incapacity in daily living, and other mental and physical results of the injury.

(2) A principal sum which will produce a reasonable amount to provide the personal service and care needed by plaintiff from the date of the verdict to the end of his period of maximum expectancy, by reason of the loss of his arms.

(3) A principal sum whose accumulated value at plaintiff's age of 21 will be sufficient for the purpose of providing an annual income which will compensate plaintiff for his loss of earnings each year during his period of maximum expectancy.

Note: Factor 3 is limited to commence at age 21 because the law does not permit an infant to recover for any loss of earnings prior to that age; since it is the duty of the parents to provide for his maintenance and care during infancy, and they have the corresponding right to recover from a wrongdoer his probable loss of earnings during that period. Therefore, this item cannot be included in a recovery by the infant.

(4) The earning power of the fund to be used as the principal in Factor 3 is estimated at two per cent annually, that being approximately the rate of interest payable on most government obligations at this time. It is assumed that interest will be collected annually and reinvested.

■ (5) Estimated income taxes are deductible from such income as is produced from interest on the fund. Plaintiff's estimated potential earnings over and above his estimated actual earnings in his crippled condition must be calculated as a net amount; that is, from his estimated potential gross earnings there must first be deducted an amount equivalent to his estimated income tax, and the remainder must be further reduced by the amount of his estimated actual earnings in his crippled condition. This net figure represents the annual estimated net earnings lost by plaintiff.

■ (6) No consideration is to be given to expenses of administration, since this expense falls into the same category as attorney's fees, which of course are not to be considered.

(7) The income tax factor used is the present day income tax less thirty per cent; it being assumed that within the near future a reduction of at least thirty per cent in the smaller income brackets will be made by Congress.

Calculations according to the foregoing rules produce the following results depending on the estimates used:

The calculation of Column I is here set forth in detail. Results in Columns II and III have been arrived at by a similar method, the purpose being to produce approximate rather than exact results. The figures used in some cases vary a few dollars from the exact figures which would be used if it were the intention to produce an exact result.

In the following computation the starting point is age 64½ years, being the limit of expectancy. The first calculation is for ½ year. The remainder are for each full year of the expectancy. The end result is the approximate principal sum required at age 4 to provide the estimated annual payments used as the basis of the calculation and completely liquidate the fund at the end of the maximum period of expectancy:

$600 Care and personal service for ½ year
1,850 Estimated potential earnings for ½ year

2,450
– 153· Income tax on $1,850 (figured at 70% present rate)

2,297
– 350 Estimated actual earnings for ½ year

1,947 Amount of payment for ½ year
1,947 ÷ 1.02 = 1,909
1,947–1,909 = 38 Interest for one full year
38 ÷ 2 = 19 Interest for ½ year
1,947–19 = 1,928 Amount required to produce the sum of 1,947 at 2% interest for ½ year.

| | I. | II. | III. |
|---|---|---|---|
| Maximum amount for pain, suffering, etc. | $50,000 | $60,000 | $60,000 |
| Maximum amount for annual care and personal service | 1,200 | 1,500 | 1,800 |
| Maximum estimated potential annual earnings from age 21 to end of period of expectancy | 3,700 | 4,000 | 4,200 |
| Maximum estimated actual annual earnings from age 21 to end of period of expectancy | 700 | 500 | 800 |
| Interest rate on fund—2% | | | |
| Income tax—30% less than at present | | | |
| Expectancy—60½ years from date of verdict | | | |
| Amount of verdict required to liquidate all items of compensation | $150,743 | $182,143 | $190,418 |

$1,928 Principal sum at age 64
1,200 Care and personal service
───────
3,128
3,700 Potential earnings
───────
6,828
− 384 Income tax credit
───────
6,444
− 700 Actual earnings
───────
5,744

5,744 ÷ 1.02 = 5,631

─────────────

$ 5,631 Principal sum at age 63
1,200 Care and personal service
───────
6,831
3,700 Potential earnings
───────
10,531
− 384 Income tax credit
───────
10,147
− 700 Actual earnings
───────
9,447

9,447 ÷ 1.02 = 9,262

─────────────

9,262 Principal sum at age 62
1,200 Care and personal service
───────
10,462
3,700 Potential earnings
───────
14,162
− 384 Income tax credit
───────
13,778
− 700 Actual earnings
───────
13,078

13,078 ÷ 1.02 = 12,821

─────────────

12,821 Principal sum at age 61
1,200 Care and personal service
───────
14,021
3,700 Potential earnings
───────
17,721
− 384 Income tax credit
───────
17,337
− 700 Actual earnings
───────
16,637

16,637 ÷ 1.02 = 16,311

─────────────

16,311 Principal sum at age 60
1,200 Care and personal service

$17,511
3,700 Potential earnings
───────
21,211
− 384 Income tax credit
───────
20,827
− 700 Actual earnings
───────
20,127

20,127 ÷ 1.02 = 19,732

─────────────

19,732 Principal sum at age 59
1,200 Care and personal service
───────
20,932
3,700 Potential earnings
───────
24,632
− 384 Income tax credit
───────
24,248
− 700 Actual earnings
───────
23,548

23,548 ÷ 1.02 = 23,086

─────────────

23,086 Principal sum at age 58
1,200 Care and personal service
───────
24,286
3,700 Potential earnings
───────
27,986
− 384 Income tax credit
───────
27,602
− 700 Actual earnings
───────
26,902

26,902 ÷ 1.02 = 26,374

─────────────

26,374 Principal sum at age 57
1,200 Care and personal service
───────
27,574
3,700 Potential earnings
───────
31,274
− 384 Income tax credit
───────
30,890
− 700 Actual earnings
───────
30,190

30,190 ÷ 1.02 = 29,598

592 Interest for one full year

─────────────

29,598 Principal sum at age 56
1,200 Care and personal service
───────
30,798

$ 3,700 Potential earnings
34,498
3 Income tax on 592
34,501
– 384 Income tax credit
34,117
– 700 Actual earnings
33,417

33,417 ÷ 1.02 = 32,761
656 Interest for one full year

_____

32,761 Principal sum at age 55
1,200 Care and personal service
33,961
3,700 Potential earnings
37,661
13 Income tax on 656
37,674
– 384 Income tax credit
37,290
– 700 Actual earnings
36,590

36,590 ÷ 1.02 = 35,872
718 Interest for one full year

_____

35,872 Principal sum at age 54
1,200 Care and personal service
37,072
3,700 Potential earnings
40,772
19 Income tax on 718
40,791
– 384 Income tax credit
40,407
– 700 Actual earnings
39,707

39,707 ÷ 1.02 = 38,928
779 Interest for one full year

_____

38,928 Principal sum at age 53
1,200 Care and personal service
40,128
3,700 Potential earnings
43,828
28 Income tax on 779

$43,856
– 384 Income tax credit
43,472
– 700 Actual earnings
42,772

42,772 ÷ 1.02 = 41,933
839 Interest for one full year

_____

41,933 Principal sum at age 52
1,200 Care and personal service
43,133
3,700 Potential earnings
46,833
34 Income tax on 839
46,867
– 384 Income tax credit
46,483
– 700 Actual earnings
45,783

45,783 ÷ 1.02 = 44,885
898 Interest for one full year

_____

44,885 Principal sum at age 51
1,200 Care and personal service
46,085
3,700 Potential earnings
49,785
40 Income tax on 898
49,825
– 384 Income tax credit
49,441
– 700 Actual earnings
48,741

48,741 ÷ 1.02 = 47,785
956 Interest for one full year

_____

47,785 Principal sum at age 50
1,200 Care and personal service
48,985
3,700 Potential earnings
52,685
49 Income tax on 956
52,734
– 384 Income tax credit
52,350
– 700 Actual earnings

$51,650

$51,650 ÷ 1.02 = 50,637

1,013 Interest for one full year

---

50,637 Principal sum at age 49
1,200 Care and personal service
51,837
3,700 Potential earnings
55,537
55 Income tax on 1,013
55,592
– 384 Income tax credit
55,208
– 700 Actual earnings
54,508

54,508 ÷ 1.02 = 53,439

1,069 Interest for one full year

---

53,439 Principal sum at age 48
1,200 Care and personal service
54,639
3,700 Potential earnings
58,339
61 Income tax on 1,069
58,400
– 384 Income tax credit
58,016
– 700 Actual earnings
57,316

57,316 ÷ 1.02 = 56,192

1,124 Interest for one full year

---

56,192 Principal sum at age 47
1,200 Care and personal service
57,392
3,700 Potential earnings
61,092
66 Income tax on 1,124
61,158
– 384 Income tax credit
60,774
– 700 Actual earnings
60,074

60,074 ÷ 1.02 = 58,896

1,178 Interest for one full year

---

$58,896 Principal sum at age 46
1,200 Care and personal service
60,096
3,700 Potential earnings
63,796
76 Income tax on 1,178
63,872
– 384 Income tax credit
63,488
– 700 Actual earnings
62,788

62,788 ÷ 1.02 = 61,557

1,231 Interest for one full year

---

61,557 Principal sum at age 45
1,200 Care and personal service
62,757
3,700 Potential earnings
66,457
82 Income tax on 1,231
66,539
– 384 Income tax credit
66,155
– 700 Actual earnings
65,455

65,455 ÷ 1.02 = 64,171

1,284 Interest for one full year

---

64,171 Principal sum at age 44
1,200 Care and personal service
65,371
3,700 Potential earnings
69,071
88 Income tax on 1,284
69,159
– 384 Income tax credit
68,775
– 700 Actual earnings
68,075

68,075 ÷ 1.02 = 66,740

1,335 Interest for one full year

---

66,740 Principal sum at age 43
1,200 Care and personal service
67,940
3,700 Potential earnings
71,640

$ 94 Income tax on 1,335
71,734
– 384 Income tax credit
71,350
– 700 Actual earnings
70,650
70,650 ÷ 1.02 = 69,265
1,385 Interest for one full year

69,265 Principal sum at age 42
1,200 Care and personal service
70,465
3,700 Potential earnings
74,165
99 Income tax on 1,385
74,264
– 384 Income tax credit
73,880
– 700 Actual earnings
73,180
73,180 ÷ 1.02 = 71,745
1,435 Interest for one full year

71,745 Principal sum at age 41
1,200 Care and personal service
72,945
3,700 Potential earnings
76,645
106 Income tax on 1,435
76,751
– 384 Income tax credit
76,367
– 700 Actual earnings
75,667
75,667 ÷ 1.02 = 74,183
1,484 Interest for one full year

74,183 Principal sum at age 40
1,200 Care and personal service
75,383
3,700 Potential earnings
79,083
111 Income tax on 1,484
79,194
– 384 Income tax credit
78,810
– 700 Actual earnings

$78,110
78,110 ÷ 1.02 = 76,578
1,532 Interest for one full year

76,578 Principal sum at age 39
1,200 Care and personal service
77,778
3,700 Potential earnings
81,478
118 Income tax on 1,532
81,596
– 384 Income tax credit
81,212
– 700 Actual earnings
80,512
80,512 ÷ 1.02 = 78,933
1,579 Interest for one full year

78,933 Principal sum at age 38
1,200 Care and personal service
80,133
3,700 Potential earnings
83,833
123 Income tax on 1,579
83,956
– 384 Income tax credit
83,572
– 700 Actual earnings
82,872
82,872 ÷ 1.02 = 81,247
1,625 Interest for one full year

81,247 Principal sum at age 37
1,200 Care and personal service
82,447
3,700 Potential earnings
86,147
127 Income tax on 1,625
86,274
– 384 Income tax credit
85,890
– 700 Actual earnings
85,190
85,190 ÷ 1.02 = 83,520
1,670 Interest for one full year

$83,520 Principal sum at age 36
1,200 Care and personal service
————
84,720
3,700 Potential earnings
————
88,420
132 Income tax on 1,670
————
88,552
– 384 Income tax credit
————
88,168
– 700 Actual earnings
————
87,468

87,468 ÷ 1.02 = 85,753

1,715 Interest for one full year

————————

85,753 Principal sum at age 35
1,200 Care and personal service
————
86,953
3,700 Potential earnings
————
90,653
139 Income tax on 1,715
————
90,792
– 384 Income tax credit
————
90,408
– 700 Actual earnings
————
89,708

89,708 ÷ 1.02 = 87,949

1,759 Interest for one full year

————————

87,949 Principal sum at age 34
1,200 Care and personal service
————
89,149
3,700 Potential earnings
————
92,849
144 Income tax on 1,759
————
92,993
– 384 Income tax credit
————
92,609
– 700 Actual earnings
————
91,909

91,909 ÷ 1.02 = 90,107

1,802 Interest for one full year

————————

90,107 Principal sum at age 33
1,200 Care and personal service
————
91,307
3,700 Potential earnings
————
95,007

$ 150 Income tax on 1,802
————
95,157
– 384 Income tax credit
————
94,773
– 700 Actual earnings
————
94,073

94,073 ÷ 1.02 = 92,228

1,845 Interest for one full year

————————

92,228 Principal sum at age 32
1,200 Care and personal service
————
93,428
3,700 Potential earnings
————
97,128
153 Income tax on 1,845
————
97,281
– 384 Income tax credit
————
96,897
– 700 Actual earnings
————
96,197

96,197 ÷ 1.02 = 94,311

1,886 Interest for one full year

————————

94,311 Principal sum at age 31
1,200 Care and personal service
————
95,511
3,700 Potential earnings
————
99,211
160 Income tax on 1,886
————
99,371
– 384 Income tax credit
————
98,987
– 700 Actual earnings
————
98,287

98,287 ÷ 1.02 = 96,360

1,927 Interest for one full year

————————

96,360 Principal sum at age 30
1,200 Care and personal service
————
97,560
3,700 Potential earnings
————
101,260
165 Income tax on 1,927
————
101,425
– 384 Income tax credit
————
101,041

$ −700 Actual earnings
100,341

100,341 ÷ 1.02 = 98,373

1,968 Interest for one full year

———————

98,373 Principal sum at age 29
1,200 Care and personal service
99,573
3,700 Potential earnings
103,273
169 Income tax on 1,968
103,442
− 384 Income tax credit
103,058
− 700 Actual earnings
102,358

102,358 ÷ 1.02 = 100,351

2,007 Interest for one full year

———————

100,351 Principal sum at age 28
1,200 Care and personal service
101,551
3,700 Potential earnings
105,251
174 Income tax on 2,007
105,425
− 384 Income tax credit
105,041
− 700 Actual earnings
104,341

104,341 ÷ 1.02 = 102,295

2,046 Interest for one full year

———————

102,295 Principal sum at age 27
1,200 Care and personal service
103,495
3,700 Potential earnings
107,195
177 Income tax on 2,046
107,372
− 384 Income tax credit
106,988
− 700 Actual earnings
106,288

106,288 ÷ 1.02 = 104,204

2,084 Interest for one full year

———————

$104,204 Principal sum at age 26
1,200 Care and personal service
105,404
3,700 Potential earnings
109,104
183 Income tax on 2,084
109,287
− 384 Income tax credit
108,903
− 700 Actual earnings
108,203

108,203 ÷ 1.02 = 106,081

2,122 Interest for one full year

———————

106,081 Principal sum at age 25
1,200 Care and personal service
107,281
3,700 Potential earnings
110,981
186 Income tax on 2,122
111,167
− 384 Income tax credit
110,783
− 700 Actual earnings
110,083

110,083 ÷ 1.02 = 107,924

2,159 Interest for one full year

———————

107,924 Principal sum at age 24
1,200 Care and personal service
109,124
3,700 Potential earnings
112,824
192 Income tax on 2,159
113,016
− 384 Income tax credit
112,632
− 700 Actual earnings
111,932

111,932 ÷ 1.02 = 109,737

2,195 Interest for one full year

———————

109,737 Principal sum at age 23
1,200 Care and personal service
110,937
3,700 Potential earnings
114,637

$ 195 Income tax on 2,195
114,832
– 384 Income tax credit
114,448
– 700 Actual earnings
113,748

113,748 ÷ 1.02 = 111,518
2,230 Interest for one full year

_____

111,518 Principal sum at age 22
1,200 Care and personal service
112,718
3,700 Potential earnings
116,418
202 Income tax on 2,230
116,620
– 384 Income tax credit
116,236
– 700 Actual earnings
115,536

115,536 ÷ 1.02 = 113,271
2,265 Interest for one full year

_____

113,271 Principal sum at age 21
1,200 Care and personal service
114,471
204 Income tax on 2,265
114,675

114,675 ÷ 1.02 = 112,426
2,249 Interest for one full year

_____

112,426 Principal sum at age 20
1,200 Care and personal service
113,626
202 Income tax on 2,249
113,828

113,828 ÷ 1.02 = 111,596
2,232 Interest for one full year

_____

111,596 Principal sum at age 19
1,200 Care and personal service
112,796
202 Income tax on 2,232
112,998

$112,998 ÷ 1.02 = 110,782
2,216 Interest for one full year

_____

110,782 Principal sum at age 18
1,200 Care and personal service
111,982
198 Income tax on 2,216
112,180

112,180 ÷ 1.02 = 109,980
2,200 Interest for one full year

_____

109,980 Principal sum at age 17
1,200 Care and personal service
111,180
195 Income tax on 2,200
111,375

111,375 ÷ 1.02 = 109,191
2,184 Interest for one full year

_____

109,191 Principal sum at age 16
1,200 Care and personal service
110,391
195 Income tax on 2,184
110,586

110,586 ÷ 1.02 = 108,418
2,168 Interest for one full year

_____

108,418 Principal sum at age 15
1,200 Care and personal service
109,618
193 Income tax on 2,168
109,811

109,811 ÷ 1.02 = 107,658
2,153 Interest for one full year

_____

107,658 Principal sum at age 14
1,200 Care and personal service
108,858
193 Income tax on 2,153
109,051

109,051 ÷ 1.02 = 106,913
2,138 Interest for one full year

_____

$106,913 Principal sum at age 13
1,200 Care and personal service
108,113
190 Income tax on 2,138
108,303

$108,303 \div 1.02 = 106,179$

2,124 Interest for one full year

---

106,179 Principal sum at age 12
1,200 Care and personal service
107,379
186 Income tax on 2,124
107,565

$107,565 \div 1.02 = 105,456$

2,109 Interest for one full year

---

105,456 Principal sum at age 11
1,200 Care and personal service
106,656
186 Income tax on 2,109
106,842

$106,842 \div 1.02 = 104,747$

2,095 Interest for one full year

---

104,747 Principal sum at age 10
1,200 Care and personal service
105,947
183 Income tax on 2,095
106,130

$106,130 \div 1.02 = 104,049$

2,081 Interest for one full year

---

104,049 Principal sum at age 9
1,200 Care and personal service
105,249
183 Income tax on 2,081
105,432

$105,432 \div 1.02 = 103,365$

2,067 Interest for one full year

---

103,365 Principal sum at age 8
1,200 Care and personal service
104,565
181 Income tax on 2,067
104,746

$104,746 \div 1.02 = 102,692$

2,054 Interest for one full year

---

102,692 Principal sum at age 7
1,200 Care and personal service
103,892
181 Income tax on 2,054
104,073

$104,073 \div 1.02 = 102,032$

2,041 Interest for one full year

---

102,032 Principal sum at age 6
1,200 Care and personal service
103,232
177 Income tax on 2,041
103,409

$103,409 \div 1.02 = 101,381$

2,028 Interest for one full year

---

101,381 Principal sum at age 5
1,200 Care and personal service
102,581
177 Income tax on 2,028
102,758

$102,758 \div 1.02 = 100,743$

---

100,743 Principal sum at age 4
50,000 Maximum amount for pain, suffering, etc.
$150,743

---

It may be stated here that to the Court's personal knowledge, there were some men on this jury who, from long experience, would be naturally expected to weigh and scrutinize figures and calculations, and to see that no imaginative or speculative considerations were permitted to influence the verdict. R. E. Plott, the foreman, has been for years an executive of one of the largest trust companies in the state. Walter H. Beckner is an officer of West Virginia's largest local life insurance company, with home offices in Charleston. John K. Robison is a veteran employee of a large public utility company which distributes gas to the Charleston area.

Considering all the foregoing facts and figures, and bearing in mind that it is the jury's province to fix the amount of the verdict and not the Court's, I am unable to reach any other conclusion than that the jury had before it sufficient evidence to justify the jury in arriving at the verdict which was rendered, and that, although exceptionally large, there is no just ground for the Court to say that it was influenced by passion, prejudice, sympathy, or any other improper motive.

Hence, defendant's motion to set aside the verdict of the jury and grant it a new trial is denied.

An appropriate order may be submitted.